**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VIRGINIA SCHEIRER,** : | |
| : | |
| **Plaintiff** : | **CIVIL ACTION NO. 3:13-CV-1397** |
| : | |
| **v.** : | |
| : | **(JUDGE MANNION)** |
| **NATIONWIDE INSURANCE** | |
| **COMPANY OF AMERICA,** : | |
| : | |
| **Defendant** : | |

## M E M O R A N D U M

Pending before the court are the cross-motions for summary judgment filed by the plaintiff and defendant. (Docs. 29, 32). Plaintiff's amended complaint, (Doc. No. 12), raised claims for breach of contract (Count I), bad faith (Count II), and violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §201-1 *et seq.* (Count III). The court has previously dismissed Count III of plaintiff's amended complaint. (Doc. 21). Plaintiff and defendant now move pursuant to Fed.R.Civ.P. 56 for summary judgment on the remaining two counts in their respective favors.


## I.    PROCEDURAL BACKGROUND

Plaintiff Virginia Scheirer is a resident of Monroe County who was riding a county bus on September 24, 2008, when she was thrown to the floor of the bus and injured as the driver swerved to avoid an oncoming vehicle. The incident was captured on a surveillance video tape. (Doc. No. 12, ¶¶ 1, 8, 9).

Plaintiff had an insurance policy from defendant Nationwide Insurance Company of America ("Nationwide"), in effect on the day of plaintiff's injury, which included tort coverage and uninsured[1] motorist ("UM") benefits of "up to $100,000.00 per person." (Id., ¶¶ 6, 7, 8). Plaintiff formally notified defendant of her UM claim on July 7, 2011, provided relevant medical documentation to the defendant, and later demanded arbitration of her claim on September 26, 2012. (Id., ¶¶ 12, 14,16). Defendant refused the arbitration request on October 10, 2012, and made a written request for a medical examination of plaintiff and a statement under oath on April 16, 2013. (Id., ¶¶ 17, 19). Plaintiff then brought the instant action in Monroe County Court alleging that the inordinate delay in handling her claim is a breach of contract, bad faith, and a violation of the UTPCPL. On May 22, 2013, defendant removed this case to federal court. (Doc. 1). Plaintiff then filed an amended complaint on June 27, 2013, alleging a breach of contract claim for UM benefits, a bad faith claim pursuant to 42 Pa.C.S. §8371, regarding defendant's handling of her UM benefits claim and a UTPCPL claim. (Doc. 12). As stated, plaintiff's UTPCPL claim was dismissed with prejudice by this court on October 23, 2013. (Doc. 21).

After the pleadings closed and discovery was completed, defendant filed

---

[1]The plaintiff in various filings has referred to both "uninsured" and "underinsured" coverage. Obviously, they are not interchangeable terms. It is clear to the court that the parties agree that this is an "uninsured" coverage claim, not an "underinsured" claim.

a motion for summary judgment, with exhibits on July 11, 2014, regarding plaintiff's two remaining counts. (Doc. 29). Defendant also filed its statement of material facts and its brief in support. (Docs. 30, 31). On July 28, 2014, plaintiff filed her motion for summary judgment and her statement of material facts. (Doc. 32, 33). On August 7 and 8, 2014, plaintiff filed exhibits and her response to defendant's statement of material facts. (Docs. 34, 36). On August 8, 2014, plaintiff filed her brief in support of her motion for summary judgment. (Doc. 37). Defendant filed its reply brief, with exhibits, in support of its motion on August 19, 2014, and filed its response to plaintiff's statement of material facts on August 28, 2014. (Docs. 38, 38-1, 39).

The cross-motions for summary judgment are ripe for disposition. The court has diversity jurisdiction over this case pursuant to 28 U.S.C. §1332. As discussed below, the defendant's motion will be granted as to the breach of contract claim, Count I, and it will be dismissed. The remaining motions will be denied since disputed material facts exist.

## II.   FACTUAL BACKGROUND[2]

Immediately after the bus accident, defendant opened a UM claim for

_____

[2]The court notes that the facts of this case are derived from the statement of facts filed by the parties and the responses thereto as well as the referenced exhibits submitted by the parties. (Docs. 30, 33, 34, 36, 38-1; and 39).

plaintiff on September 26, 2008. Plaintiff's insurance policy, issued by defendant, provided for "up to $100,000.00 per person" in UM benefits. The UM adjuster for defendant met with plaintiff and recorded her statement on October 1, 2008. (Doc. 38-2). In her statement, plaintiff, who was 73 years old, stated that after the bus driver swerved to avoid a pick up truck and slammed on the brakes, she was "thrown from the front seat with her shopping cart, the length of the bus, right up to the front of the bus." Plaintiff then told the bus driver that she would get up herself and that she could walk home by herself. Plaintiff then walked home. The day after the accident, September 25, 2008, plaintiff did not feel well, she had a horrible headache, and she was beginning to show large bruises. She called the bus company and it picked her up and took her to the Pocono Hospital to be examined and to have tests, including x-rays and a CT scan of her head. Plaintiff did not have any broken bones, but she had multiple contusions.

The adjuster for defendant closed plaintiff's UM claim on October 10, 2008. The adjuster was aware that the bus had a video showing the unidentified vehicle involved in the accident but did not attempt to obtain a copy of it.

In a letter dated July 7, 2011, plaintiff's counsel advised defendant that plaintiff was pursuing a primary UM claim against the bus company's insurer, Travelers Insurance Company ("Travelers"), and that the policy limits was $35,000. Plaintiff's counsel also stated that plaintiff was placing defendant "on

4

notice of an [UM] claim [against defendant] arising out of the September 24, 2008 incident." (Doc. 38-3).

There is no dispute that plaintiff resolved the first level UM claim against Travelers for its $35,000 policy limits. It is disputed whether defendant's adjuster believed that he had no responsibility to evaluate plaintiff's UM claim until he received confirmation of the policy limit offer by Travelers.

Another apparently critical issue for the defendant was the amount of UM coverage the plaintiff could be awarded under Travelers' insurance policy. Defendant's adjuster William Branigan noted the need to make this determination as early as October 6, 2008. According to the plaintiff, however, this was not confirmed until a later adjuster handling plaintiff's UM claim Brenda Freyz's own log entry dated July 14, 2011, stating that she had spoken to Travelers and "confirmed UM limit is $35k."

The parties also dispute whether defendant's UM claim handlers thought that plaintiff had to exhaust the UM coverage under the Travelers' policy before Nationwide had to evaluate her claim. Glenn Newton, defendant's claims manager, clarified this issue and testified that while plaintiff had to first exhaust the Travelers' UM coverage, Nationwide's responsibility to investigate and evaluate her claim began when it first got the claim. (Doc. 34-2, at 105-106). This makes sense since Nationwide was entitled to a credit in the amount of Travelers' UM coverage, in accordance with Nationwide Ins. Co. v. Schneider, 960 A.2d 442 (Pa. 2008), and it had to

determine if the value of plaintiff's UM claim against it exceeded the amount of coverage available to plaintiff under the Travelers' policy.

The parties further dispute whether defendant provided training specific to the handling of UM claims and whether defendant had UM specific claims manuals. Mark Long, a claims manager with defendant who managed adjusters handling plaintiff's UM claim, stated that Nationwide provided general training as well as policy training to its adjusters but not specific to the handling of UM claims. Long also stated that Nationwide did not have a claims-handling manual specifically for UM claims. (Doc. 34-14, at 16-17). Plaintiff suggests that this lack of specific training and manual for UM claims also contributed to the undue delay in handling her claim. However, defendant did have a "Best Claims Practices" that pertained to casualty claims which included UM claims. There is no dispute that on July 30, 2014, "defendant provided plaintiff with copies of the relevant Best Claim Practices document pertaining to UM claims, in effect from 2008 until the present, upon receipt of a signed confidentiality agreement from plaintiff's counsel." (Doc. 39, at 14).

On July 17, 2012, plaintiff demanded the policy limits available under her UM coverage with defendant and provided all of her medical records to defendant, including records dating back to 2001. Also, plaintiff provided defendant with a copy of her first party medical file and a copy of the video from the bus. Plaintiff's counsel sent letters to defendant's attorney on September 25, 2012, and on April 10, 2013,  stating that on September 20,

6

2012, defendant's adjuster confirmed he had all records needed to review plaintiff's UM claim. (Docs. 34-6, 34-8). However, as defendant states, "[a] genuine issue exists as to the subject matter of plaintiff's counsel letter[s]." (Doc. 39, at 10).

On November 8, 2013, defendant proposed an arbitration guaranteeing plaintiff $35,000 with a maximum recovery of $100,000. On February 12, 2014, following the agreed to binding arbitration, plaintiff received a total gross arbitration award of $124,785.09 for her UM claim. The defendant received a credit in the amount of $35,000 which was the amount of Travelers' UM policy, which was already paid to plaintiff. The net amount of UM coverage awarded to plaintiff was $89,785.09. On March 11, 2014, defendant paid plaintiff the net arbitration award.

At all times, plaintiff had demanded the $100,000 policy limits from defendant and never reduced her demand. Before the arbitration, defendant offered plaintiff $25,000 to settle her UM claim. Plaintiff states that at the time of defendant's offer in November 2013, defendant was aware that Medicare had asserted a lien in the amount of $34,785.09. Defendant notes in its reply brief that its attorney, Aaron Decker, will testify at trial that on January 9, 2014, he made an offer via the telephone to settle plaintiff's UM claim for $50,000. (Doc. 38, at 9 n. 6). However, no documentation has been provided by defendant to substantiate this assertion.

The value of the UM claim awarded by the arbitrator was driven by

7

plaintiff's left knee replacement. Plaintiff states that on August 15, 2012, she informed defendant that her left knee replacement was her major injury from the bus accident and that she provided defendant with an expert medical opinion on causation of her knee replacement from Dr. Eugene Chiavacci, on December 3, 2012. The parties agree that in his November 2012 report, Dr. Chiavacci, plaintiff's long time treating orthopedic surgeon, opined that the right knee replacement which Dr. Frederick Barnes performed on plaintiff was directly related to the bus accident.

Plaintiff also states that on April 10, 2013, she advised defendant she would proceed with litigation if defendant did not respond to her demand for settlement for the $100,000 policy limits by April 17, 2013. Defendant responded to plaintiff via a letter dated April 16, 2013 and, stated that Dr. Barnes, who had performed the surgery, had not related plaintiff's knee replacement to the bus accident. For the first time, in this letter, the defendant requested that the plaintiff undergo an independent medical exam ("IME"). In response to defendant's letter, plaintiff provided a November 22, 2013 report from Dr. Barnes confirming Dr. Chiavacci's causation opinion and concluding that he (Dr. Barnes) considered the September 24, 2008 bus accident as aggravating plaintiff's pre-existing severe arthritis in her left knee which resulted in her left total knee replacement surgery of September 26, 2011. (Doc. 34-9).

Defendant, thereafter, obtained an expert medical report from Dr.

Thomas Allardyce, a board certified orthopedic surgeon, who examined the plaintiff on January 23, 2014, and concluded that the plaintiff did not suffer "any demonstrable condition to her already severely arthritic knee" and, opined that plaintiff's left knee replacement was not related to the bus accident. Dr. Allardyce also reviewed plaintiff's medical records as well as answers to interrogatories and plaintiff's deposition transcript, but he was not provided the bus surveillance video. The medical records which Dr. Allardyce reviewed for his January 2014 IME included records provided to defendant as early as September 20, 2012.

Although Dr. Allardyce's examination did not take place until January 2014, just two weeks before the February 6, 2014 binding arbitration, the plaintiff points out that the defendant's own records suggest that the defendant had made the decision that an IME needed to be conducted almost a year earlier, by January 29, 2013. This decision to have plaintiff examined apparently resulted from the defendant's review of the surveillance video which the defendant had in its possession even earlier on September 18, 2012.

The activity log of defendant dated March 27, 2013, indicated that defendant was considering an IME for plaintiff "to address the relatedness of the injury in light of the [bus surveillance] video." Before this log entry, defendant had received written confirmation that Travelers had extended plaintiff its policy limits and it reviewed the bus video, and defendant also

reviewed plaintiff's medical records showing that she had a prior right knee replacement and had complained about left knee pain caused arthritis a year prior to the accident.

The defendant maintains that it did not have all of the information necessary to complete its investigation of plaintiff's UM claim and to respond to plaintiff's December 3, 2012 demand for the $100,000 UM policy limits and, plaintiff contends that defendant cannot identify any records it was missing or that it requested. However, defendant's activity log entries show that as of January 29, 2013, defendant was waiting for an IME and additional records as well as the bus video to evaluate plaintiff's claim. The additional records and the bus video were received by defendant on January 30, 2013, however, as mentioned, the IME of plaintiff was not performed until January 2014. There is no dispute that defendant's investigation of plaintiff's UM claim was complete upon receipt of its IME report. The dispute is over whether the IME should have been conducted much sooner.

The parties also dispute whether plaintiff's deposition was unduly delayed. In a letter dated February 15, 2012, plaintiff's counsel offered to make plaintiff available for a deposition on March 16, 2012, by "counsel for Nationwide." Defendant states that the letter was sent in the context of a suit pending against the bus company and, prior to the assignment of counsel by defendant and prior to defendant having all of the required information. Additionally, plaintiff indicates that defendant's attorneys failed to respond to

10

her counsel's July 16, 2013 e-mail regarding the scheduling of her deposition. However, plaintiff had already filed the present action in court at the time of the e-mail and defendant's motion to dismiss was pending. Eventually, plaintiff's deposition was scheduled for September 27, 2013. (See Docs. 36, ¶'s 14-25, 38-1, ¶'s 14-25).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 ; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(a court may not weigh the evidence or make credibility determinations). Rather, the court must

consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## IV.   DISCUSSION

### *1. Breach of Contract Claim, Count I*

Count I of plaintiff's amended complaint asserts a breach of contract claim for UM benefits under her insurance policy arising from her injuries sustained in the September 24, 2008 bus accident. Defendant argues that because the UM claim has been resolved by way of an agreed upon binding arbitration and award, Count I of plaintiff's amended complaint should be dismissed. (Doc. 29). The court agrees.

It is undisputed that on February 12, 2014, the plaintiff's UM claim was resolved by way of binding arbitration that resulted in a total gross award to plaintiff in the amount of $124,785.09. (Docs. 29-2, 33, at 1, 39, at 7). The insurance policy which defendant issued to plaintiff had UM coverage limits of $100,000. The defendant received a credit in the amount of $35,000, representing the full amount of the Travelers' UM policy, which plaintiff had already collected, leaving the total amount of UM benefits owed by defendant as $89,785.09. The defendant paid plaintiff the net arbitration award in March of 2014. The defendant did not appeal or challenge the arbitrator's award as "the parties had agreed to resolve Count I by way of binding arbitration, and the Binding Arbitration Agreement provided that the finding of the trier of fact is 'not appealable to a Court for further jurisdiction.'" (Docs. 39, at 7; 34, at 4).

Count I of plaintiff's amended complaint alleging breach of the insurance contract has been resolved. Therefore, the court will dismiss Count I.

### *2. Bad Faith Claim, Count II*

Count II is based upon defendant's handling of plaintiff's UM claim and is brought pursuant to Pennsylvania's bad faith statute, 42 Pa.C.S. §8371. In her amended complaint, (Doc. 12, at 4-5), plaintiff alleges, *inter alia,* that defendant acted in bad faith by failing to properly and promptly evaluate and investigate her UM claim, by failing to timely respond to her demands, by failing to promptly resolve her claim within the policy limits, by failing to act promptly upon communication regarding her claim, by failing to have reasonable standards with respect to her claim, by failing to pay her claim when it had all of the necessary information, by failing to provide a fair and equitable settlement of her claim, by failing to negotiate with her counsel, by forcing her to commence litigation to recover her rightful amount due under her policy, and by offering her substantially less than the amounts due on her claim. The crux of plaintiff's bad faith claim is the alleged untimely manner in which defendant handled her UM claim.

Initially, since this federal court has diversity jurisdiction over this case, it applies Pennsylvania state law. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir.2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817 (1938)).

> 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest

14

> purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (*quoting* Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994)). To succeed on a bad faith claim, a plaintiff must demonstrate "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Verdetto v. State Farm Fire & Cas. Co., 837 F. Supp. 2d 480, 484 (M.D. Pa. 2011), *aff'd*, 2013 WL 175175 (3d Cir. Jan. 17, 2013) (*quoting* Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)). Mere negligence, however, is not sufficient to establish a bad faith claim. *See* id. (*citing* Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994)). In addition, a plaintiff must demonstrate both elements of a bad faith claim by clear and convincing evidence. *See* id.

For an insurance company to show that it had a reasonable basis, it need not demonstrate its investigation yielded the correct conclusion, or that its conclusion more likely than not was accurate. Krisa v. Equitable Life Assur. Soc., 113 F.Supp.2d. 694, 704 (M.D. Pa. 2000). The insurance company also is not required to show that "the process by which it reached its conclusion was flawless or that the investigatory methods it employed eliminated possibilities at odds with its conclusion." Id. Instead, an insurance company

15

must show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action. Id.

"The 'clear and convincing' standard requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004) (*quoting* Bostick v. ITT Hartford Group, Inc., 56 F.Supp. 2d 580, 587 (E.D. Pa.1999)). The plaintiff's burden is equally high at the summary judgment stage of litigation, and plaintiff must point to evidence that meets this heavy evidentiary requirement. J.C. Penney, 393 F.3d at 367 (*citing* Kosierowski v. Allstate Ins. Co., 51 F.Supp. 2d 583, 588 (E.D. Pa.1999)). Further, "[i]n a bad faith case, summary judgment is appropriate when there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." Bostick v. ITT Hartford Group, Inc., 56 F.Supp.2d 580, 587 (E.D.Pa.1999) (citation omitted).

Pennsylvania's bad faith statute, 42 Pa.C.S. §8371, outlines actions a court may take should it find that an insurer has acted in bad faith:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

16

(2) Award punitive damages against the insurer.
(3) Assess court costs and attorney fees against the
insurer.

"Pennsylvania law does not limit bad faith claims to unreasonable denials of coverage[]" and, "[a] bad faith can have various other bases, including an insurer's lack of investigation, lack of adequate legal research concerning coverage, or failure to communicate with the insured." Davis v. Allstate Property and Cas. Co., 2014 WL 4857434, *9 (E.D.Pa. September 30, 2014) (citing Coyne v. Allstate Insurance Company, 771 F.Supp. 673, 678 (E.D.Pa. 1991); Smith v. Allstate Insurance Company, 904 F.Supp.2d 515, 524 (W.D.Pa. 2012)); Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 n. 9 (3d Cir.1999) (a bad faith claim includes "a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured.").

Plaintiff bases, in large part, her bad faith claim on the above stated alternative grounds. As stated, bad faith is not limited to the insurance company's bad faith in denying its insured's claim and can include the company's investigative practices. Douglas v. Discover Property & Cas. Ins. Co., 810 F.Supp.2d 724, 733 (M.D.Pa. 2011) (citations omitted).

In light of the aforementioned facts of record in this case, the court finds, *inter alia,* that disputes exist as to whether defendant conducted a prompt investigation of plaintiff's UM claim, as to whether defendant promptly evaluated and investigated plaintiff's UM claim, as to whether defendant failed

17

to timely respond to plaintiff's demands, as to whether defendant failed to promptly resolve plaintiff's claim within the $100,000 policy limits, as to whether defendant failed to act promptly upon communication regarding plaintiff's claim, as to whether defendant failed to have reasonable standards with respect to plaintiff's UM claim, and as to whether defendant failed to timely pay plaintiff's UM claim when it had all of the necessary information.

"Under Pennsylvania law, an insurer may be liable for bad faith if it fails to make a good faith investigation into the facts of a claim, or engages in a frivolous or unfounded refusal to pay proceeds of a policy." Hall v. Nationwide Mut. Ins. Co., 2012 WL 5381426, *7 (W.D.Pa. October 31, 2012) (citing Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa.Super. 2004)). "Ultimately, the insured must show that 'the insurer breached its duty of good faith through some motive of self-interest or ill will.'" Id. (quoting Brown, 860 A.2d at 501).

In the instant case, a reasonable trier of fact could find that the defendant failed to make a good faith and timely payment on plaintiff's UM claim. For instance, whether the defendant acted unreasonably when it asserted it did not have all information necessary to complete its investigation into her UM claim and respond to her demand for the policy limits. There is contrary evidence to show that defendant indeed may have had all required records, yet failed to reasonably and timely compensate plaintiff for her injuries. Additionally, even though supplemental records and the bus video

18

were received by defendant in January 2013, the IME of plaintiff was not performed until January 2014. The evidence is also disputed as to whether plaintiff's deposition was unduly delayed and, if defendant failed to timely respond to the letters of plaintiff's counsel as well as his demands for the $100,000 policy limits.

In short, the record is not clear if defendant breached its duty of good faith regarding its handling of plaintiff's UM claim and, if so, whether this breach was through a motive of self-interest or ill will as opposed to mere negligence. Thus, disputed issues of material fact exist and it cannot be determined from the record whether the defendant acted in bad faith. *See* Douglas v. Discover Property & Cas. Ins. Co., 810 F.Supp.2d at 733 ("a genuine issue of material fact remains as to whether defendants acted in bad faith towards plaintiffs." "A reasonable jury could credit either party's account of what motivated [insured's] decision ... .").

## V.     CONCLUSION

Based on the record, the court finds questions of material fact exist as to whether defendant handled plaintiff's UM claim in bad faith and with an improper motive. As such, the court will deny the motions for summary judgment, (Docs. 29, and 32), of both parties regarding plaintiff's bad faith claim, Count II of her amended complaint. Count I of plaintiff's amended complaint alleging a breach of contract claim will be dismissed. An

appropriate order will be entered.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: March 9, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1397-02.wpd